02-10-475-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00475-CV

 

 


 
 
 In the Interest of C.S.L.E.H. and C.H.H., Jr.,
 Children
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I. Introduction

          Appellant C.H. Sr. (Father)
appeals from the order terminating his parental rights to his children,
C.S.L.E.H. and C.H.H. Jr.  We will affirm.

II. Factual
and Procedural Background

          Father
is the alleged biological father of C.S.L.E.H. and C.H.H. Jr.  C.S.L.E.H. was
born in April 2005, and C.H.H. Jr. was born in July 2007.  Both children tested
positive for cocaine at birth.

          The
children’s biological mother, T.A., admitted to using drugs during her pregnancies
and to having a long history of drug abuse.  She was unable to rehabilitate and
maintain sobriety, so the trial court terminated her parental rights in
December 2008. The court declined to terminate Father’s rights at that time.

          Prior
to her rights being terminated, T.A. primarily cared for the children. 
Although Father did not live with the children, he saw them regularly before
Appellee Texas Department of Family Protective Services’ (TDFPS) Child
Protective Services (CPS) unit removed the children and placed them in a foster
home in November 2007.  Father was involved with T.A. for a number of years and
was “vaguely” aware of her drug abuse before CPS removed the children.

          CPS
caseworker Penny Smith received a referral related to C.H.H. Jr.’s birth in
July 2007.  In an attempt to avoid removal and foster care, Smith placed the
children with T.A.’s oldest daughter as part of a safety plan.  Smith said that
CPS did not place the children with Father because he never responded to her
attempts to contact him and because he was previously convicted of aggravated
possession of a controlled substance.  Smith also declined to place the
children with their paternal grandmother because Smith suspected that Father was
living with her.  Smith contacted Father for placement suggestions, but he
never responded.

          In
November 2007, Paula Rietz, a Program Director at CPS, received a referral that
the children may have been physically abused and neglected.  She then
discovered that the children were not residing with their adult sister as
designated by the safety plan.  The children were instead residing with a woman
not named in the safety plan, whom CPS determined to be an unsuitable caregiver.
 Rietz communicated with Father during the removal process but excluded him as
a placement option because he refused to take a drug test.  In her last efforts
to avoid removal, Rietz asked Father and T.A. for additional family members
that might be able to keep the children.  Father gave Rietz his sister’s name,
but Rietz was unable to locate her, and T.A. did not provide Rietz with any
names.

          While
T.A. admitted to having a drug problem, Father denied having any substance
abuse problems of his own.  Father began using heroin (his primary drug of
choice) at age eighteen, and he admitted to using it as recently as June 2009.  Father
also admitted to using cocaine (his secondary drug of choice) in December 2007
and May 2008.  Even though Father insisted that he did not have a drug problem,
CPS caseworker Abigail Flores suggested that Father take a drug assessment and
follow its recommendations, namely drug rehabilitation treatment.

          In
June 2008, Father received detox treatment at the Billy Gregory facility.  His
treatment included doses of Suboxone, prescribed for heroin withdrawal
symptoms.  Father then moved to the Pine Street facility for an inpatient drug
rehabilitation program.  Father’s patient records indicated that he used heroin
for thirty-nine years and used heroin three to six times per week for the six
months prior to his admission to Pine Street.  Father’s discharge summary,
dated September 2008, stated that “client is chemically dependent on heroin,
gets easily frustrated when he fails to get his way and he lacks appropriate
coping skills.”  As part of his relapse prevention plan, Father wrote down
alternative activities to mood-altering drugs and noted that heroin would kill
him and prevent him from being reunited with his two children.

          Father
testified at T.A.’s termination trial in September 2008 that he would never use
drugs again.  But since then, Father has never tested negative for drugs. 
Shortly after the September 2008 trial, Father tested positive for cocaine and heroin
in December 2008.

          In
January 2009, the trial court signed an order that set forth tasks that Father
agreed to perform in order to have his children returned.  These tasks included
submitting to random drug testing.  Six days after the court signed the order,
Father admitted cocaine use, and on January 13, he tested positive for cocaine.

From
February 2009 through December 2009, Father failed to attend four separately
scheduled drug tests after Flores personally told him to do so.  In May 2009,
November 2009, and August 2010, Father arrived at the testing facility but was
unable to provide a testable sample.  After struggling to obtain a urine sample
from Father, CPS decided to take samples of Father’s hair.  However, this
alternative method failed because Father had no hair.[2]

          In
January 2010, Father admitted to using cocaine and opiates and tested positive
for cocaine.  In April 2010, Father tested positive for cocaine, codeine,
morphine, and heroin.  In August 2010, Father was present for a random drug
test, but he refused an oral swab.

          The
tasks that Father was required to perform in order to regain custody of his
children also included paying $270 per month in child support.  Father owed a
balance of $6,493.50 at the time of trial in December 2010.  Father, however,
claims to have made the first two payments.  He attributes his failure to make
further payments to his unemployment.

          Although
Father testified in the 2008 trial that at that time he worked at least forty
hours per week, he never provided proof of employment, despite repeated
requests from caseworkers.  Father told Flores that he unloaded trucks in Wichita
Falls, but he never provided her with a pay stub, a phone number, or even his
employer’s name.

          Father
testified that he sustained a back, neck, and nerve injury in April 2009 that prevented
him from working until the Fall of 2010.  During the couple of months before
trial, during which Father was able to work, he did not go to any specific
employers or to the Texas Workforce Commission to find work.  Father testified
that he went to a church that builds HUD homes and that he planned to file for
his own disability and Social Security from his late wife.

          The
trial court’s 2009 temporary order further provided that Father complete
parenting classes.  Father completed forty-two hours of parenting classes
before the 2008 trial, but he did not complete any parenting classes after the
2009 order.  Father testified that one set of classes was sufficient.

          In
response to Father’s failure to comply with the court order, among other acts
or omissions, TDFPS petitioned the trial court in January 2010 to terminate his
parental rights.  The trial court terminated Father’s parental rights in
December 2010.  This appeal followed.

III.  Burden
of Proof and Standard of Review

          A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388,
1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While
parental rights are of constitutional magnitude, they are not absolute.  Just
as it is imperative for courts to recognize the constitutional underpinnings of
the parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In re
C.H., 89 S.W.3d 17, 26 (Tex. 2002).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick v. Smith, 685 S.W.2d 18, 20–21 (Tex. 1985);
In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination
is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West
Supp. 2010); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both
elements must be established; termination may not be based solely on the best
interest of the child as determined by the trier of fact.  Tex. Dep’t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. §§ 161.001, 161.206(a) (West 2008).  Evidence is clear and convincing
if it “will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established.”  Id.
§ 101.007 (West 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see
In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting
standards for termination and modification).

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were proven. 
In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the
evidence in the light most favorable to the finding and judgment.  Id. 
We resolve any disputed facts in favor of the finding if a reasonable
factfinder could have done so.  Id.  We disregard all evidence that a
reasonable factfinder could have disbelieved.  Id.  We consider undisputed
evidence even if it is contrary to the finding.  Id.  That is, we
consider evidence favorable to termination if a reasonable factfinder could,
and we disregard contrary evidence unless a reasonable factfinder could not.  Id. 
We cannot weigh witness credibility issues that depend on the appearance
and demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573–74.

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent violated the relevant conduct provisions
of section 161.001(1) and that the termination of the parent-child relationship
is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; C.H.,
89 S.W.3d at 28.  If, in light of the entire record, the disputed evidence that
a reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.

IV.  Evidentiary Sufficiency—Endangerment

          In
his first issue, Father argues that the evidence is both legally and factually
insufficient to support the trial court’s family code section 161.001(1)(D) and
(E) endangerment findings.

          Endangerment
means to expose to loss or injury, to jeopardize.  In re J.T.G.,
121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).  The trial court may
order termination of the parent-child relationship if it finds by clear and
convincing evidence that the parent has knowingly placed or knowingly allowed
the child to remain in conditions or surroundings that endanger the physical or
emotional well-being of the child.  Tex. Fam. Code Ann. § 161.001(1)(D).  Under subsection (D), it is
necessary to examine evidence related to the environment of the child to
determine if the environment was the source of endangerment to the child=s
physical or emotional well-being.  In re D.T., 34 S.W.3d 625, 632
(Tex. App.—Fort Worth 2000, pet. denied).  A child is endangered when the
environment creates a potential for danger that the parent is aware of but
disregards.  In re M.R.J.M., 280 S.W.3d 494, 502 (Tex. App.—Fort Worth
2009, no pet.).  Inappropriate, abusive, or unlawful conduct by persons who
live in the child’s home or with whom the child is compelled to associate on a
regular basis in his home is a part of the “conditions or surroundings” of the
child’s home under section 161.001(1)(D).  Id.  Conduct of a parent in
the home can create an environment that endangers the physical and emotional
well-being of a child.  J.T.G., 121 S.W.3d at 125.

          The
trial court may order termination of the parent-child relationship if it finds
by clear and convincing evidence that the parent has engaged in conduct or
knowingly placed the child with persons who engaged in conduct that endangers
the physical or emotional well-being of the child.  Tex. Fam. Code Ann.
§ 161.001(1)(E).  Under subsection (E), the relevant inquiry is whether
evidence exists that the endangerment of the child=s
physical or emotional well-being was the direct result of the parent=s
conduct, including acts, omissions, and failures to act.  J.T.G., 121
S.W.3d at 125.  Termination under subsection (E) must be based on more than a
single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  Id.; D.T., 34 S.W.3d
at 634.

          As
a general rule, conduct that subjects a child to a life of uncertainty and
instability endangers the child=s physical and emotional
well-being.  In re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio
1998, pet. denied).  To support a finding of endangerment, the parent’s conduct does not
necessarily have to be directed at the child, and the child is not required to
suffer injury.  Boyd, 727 S.W.2d at 533.  The specific danger to the
child=s
well-being may be inferred from parental misconduct alone, and to determine
whether termination is necessary, courts may look to parental conduct both
before and after the child=s birth.  Id.; In re
D.M., 58 S.W.3d 801, 812–13 (Tex. App.—Fort Worth 2001, no pet.).  A
factfinder may also infer from past conduct endangering the well-being of the
child that similar conduct will recur if the child is returned to the parent.  See
In re D.L.N., 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied),
disapproved on other grounds by J.F.C., 96 S.W.3d at 256, and C.H.,
89 S.W.3d at 17.  A parent’s engaging in illegal drug activity after agreeing
not to do so in a service plan for reunification with his children is
sufficient to establish clear and convincing proof of voluntary, deliberate,
and conscious conduct that endangered the well-being of his children.  In re
T.N., 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.).

          Because
the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated,
we conduct a consolidated review.[3]  See In re
T.N.S., 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); J.T.G.,
121 S.W.3d at 126.  While Flores testified that she was concerned about Father’s
stability because of his inability to maintain employment, she stated that her
primary concerns were his cocaine and heroin use and his inability to provide a
safe environment for the children.

          Father
was convicted of aggravated possession of a controlled substance in the late
1980s, for which he served time in prison.  There is evidence that Father used
heroin and cocaine for over half of his life.  Although Father completed drug
treatment in 2008, he admitted to using heroin in June 2009.  During TDFPS’s involvement
with Father, he never provided proof of employment or tested negative for drugs.

          Father
argues that many of his positive drug tests actually resulted from his failure
to appear for drug tests and from an inability of the testing site to obtain a
testable sample.  But the evidence indicates that Father tested positive for
illegal substances four times after the children were removed in November
2007.  Although Father attended drug rehabilitation in 2008 after his first
three positive drug tests, he admitted to relapsing and using heroin again in
June 2009.  Father testified that two of the 2010 drug tests were inaccurate,
but he provided no reason for their alleged inaccuracy.[4] 
The trial court was the sole judge of Father’s credibility, and his positive
drug tests were evidence that he engaged in conduct that endangered his
children’s well-being.  See T.N., 180 S.W.3d at 383.

          Furthermore,
the evidence indicates that Father failed to attend five scheduled drug tests. 
Although Father testified that he attended four of the tests that Flores said he
had missed, he offered no explanation for why the tests were not recorded or
performed.[5]  In judging the
credibility of the witnesses, the trial court could have reasonably inferred from
Father’s failure to attend drug screenings that he avoided the tests because he
was using drugs.  See In re W.E.C., 110 S.W.3d 231, 239 (Tex. App.—Fort
Worth 2003, no pet.); see also J.P.B., 180 S.W.3d at 574.

          Finally,
there is evidence that Father was responsible for the testing site’s occasional
inability to obtain a testable sample.  After CPS struggled to collect Father’s
urine sample, it decided to test Father’s hair.  However, a testable hair
sample was unobtainable because Father had no hair.  While Father told CPS
workers that he had no hair because he was Native American, he had previously
indicated on MHMR records that he was African-American.  The trial court could
have interpreted Father’s repeated drug test refusals and his lack of hair at
testing times but having hair at trial as an indication that he was using illegal
drugs after the children’s removal, which is evidence demonstrating
endangerment.  See Cervantes-Peterson v. Tex. Dep’t. of Family &
Protective Services, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006,
no pet.).

          Father
argues that CPS is at fault for not clearly indicating its expectations for his
continued drug treatment and for not seeking to provide him with further drug
treatment after his post-rehab positive drug tests.  However, the focus of this
issue is whether Father’s conduct endangered the children, not the reasons why he
engaged in such conduct or what CPS could have done differently.  Cf. In re
R.F., 115 S.W.3d 804, 810 (Tex. App.—Dallas 2003, no pet.) (noting that
mother’s continuing course of destructive behavior that endangered her children
may be attributed to, but could not be excused by, her sexual and physical
abuse as a child and acknowledging that CPS could have handled her case as a
child differently, but stating that mother did little to help herself).  Also,
Father admitted at trial that he had written in his relapse prevention plan
that using heroin again could kill him and could also prevent him from
achieving his goals of reunification with his children.  Furthermore, Flores
testified that Father’s original service plan (which included drug treatment)
never expired, that he understood that he must abide by it, and that CPS
provided him with access to programs that could assist him with his drug
problem.

          Father
also argues that “there was no evidence that [he] ever directly or indirectly
performed any act or omission that would constitute endangerment as to the
children.”  He contends that the children did not reside with him and that
there is no evidence that he had used drugs while in the possession of the
children or that the children were ever neglected or abused as a result of any
drug use.  To support a finding of endangerment, however, Father’s conduct did
not necessarily have to be directed at the children, and the children were not
required to suffer injury.  See Boyd, 727 S.W.2d at 533.  Father’s
heroin and cocaine use after TDFPS removed the children is sufficient to
constitute endangerment.  See Cervantes-Peterson, 221 S.W.3d at
253–54.

          Furthermore,
although Father did not live with T.A. when C.H.H. Jr. was born, Father
testified that he visited the children at her house almost every day and that
he was vaguely aware of T.A.’s drug use.[6]  Thus, the trial court
could have considered Father’s failure to take action to protect his children
from T.A.’s drug abuse as sufficient evidence to establish that he knowingly
allowed the children to remain in conditions or surroundings that endangered
their well-being.  See Edwards v. TDPRS, 946 S.W.2d 130, 138 (Tex. App.—El
Paso 1997), overruled on other grounds, J.F.C., 96 S.W.3d at 267 n.39.

          Likewise,
the trial court could have reasonably concluded that Father’s prior drug
conviction, his continued drug use, and his failure to maintain employment
established a course of conduct that endangered the well-being of the children. 
See In re R.W., 129 S.W.3d 732, 743 (Tex. App.—Fort Worth
2004, no pet.) (noting that imprisonment alone is insufficient to show a
continuing course of conduct that endangers the physical or emotional
well-being of a child, but when considered in conjunction with evidence of
substance abuse, mental instability, and sexual misconduct, such evidence
provides further proof of conduct that endangered child’s well-being).

          Accordingly,
giving due deference to the trial court’s findings, we hold that the trial
court could have formed a firm belief or conviction that Father engaged in
conduct or knowingly placed or knowingly allowed the children to remain in
conditions that endangered their physical or emotional well-being.  See
Tex. Fam. Code. Ann. § 161.001(1)(D), (E).  We hold that the evidence is
legally and factually sufficient to support the trial court’s family code
section 161.001(1)(D) and (E) findings, and we overrule Father’s first issue. 
Having overruled this issue, we need not address—and therefore overrule—his
second issue challenging the legal and factual sufficiency of the evidence to
support the trial court’s section 161.001(1)(O) finding.  See Tex. R.
App. P. 47.1; J.L., 163 S.W.3d at 84 (stating that parent must have
committed only one of the acts prohibited under family code section 161.001(1)
for termination of her parental rights).

V.  Evidentiary Sufficiency—Best Interest

          In
his third issue, Father argues that the evidence is legally and factually
insufficient to support the trial court’s finding that termination of the
parent-child relationship between Father and the children is in the children’s
best interest.  He contends that TDFPS did not overcome the strong presumption
that the best interest of the child is served by keeping the child with the
parent.  See In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).

          While
we strongly presume that keeping a child with a parent is in the child’s best
interest, we also presume that prompt and permanent placement of the child in a
safe environment is in the child’s best interest.  Tex. Fam. Code Ann.
§ 263.307(a) (West 2008) (listing factors that should be considered in
evaluating the parent’s willingness and ability to provide the child with a
safe environment).  In a termination case, the trier of fact may use the
following nonexclusive factors in determining the best interest of the child:  (A) the
desires of the child; (B) the emotional and physical needs of the child
now and in the future; (C) the emotional and physical danger to the child
now and in the future; (D) the parental abilities of the individuals
seeking custody; (E) the programs available to assist these individuals to
promote the best interest of the child; (F) the plans for the child by
these individuals or by the agency seeking custody; (G) the stability of
the home or proposed placement; (H) the acts or omissions of the parent
which may indicate that the existing parent-child relationship is not a proper
one; and (I) any excuse for the acts or omissions of the parent.  Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).  These factors are not
exhaustive:  some may be inapplicable, and additional factors may be considered
when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore,
undisputed evidence of one factor may be sufficient in a particular case to
support a finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each factor will
not support such a finding.  Id.  The same evidence of acts or omissions
used to establish grounds for termination under section 161.001(1) may be
probative in determining the best interest of the child.  Id. at 28.

          A.      The
Desire of the Child

 

          While
the children are very young and have not explicitly expressed their desires,
Flores testified that the children share a close bond with their foster parents,
with whom they have been living for three years.  Flores also testified that
the children call Father “Daddy” during their visits with him; and Father
testified that C.H.H. Jr. “runs through the lobby hollering Daddy at the CPS
office” when he arrives for a visit.

B.      The
Emotional and Physical Needs of the Children Now and in the Future

 

          Flores
testified that C.S.L.E.H. is confused by the fact that she has a mommy and daddy
at home and another dad somewhere else.  Flores also stated that a court’s
final decision would help give the children a permanent home and provide needed
closure for the children.  She said that the back-and-forth visits interfere
with the children’s schooling.

          The
children’s foster mother testified that she builds trust and a bond with C.S.L.E.H.
when the two participate in Momma-[Daughter] Day.  The foster mother said that
she talks to and listens to C.S.L.E.H. and that C.H.H. Jr. refers to her as
“Mommy” and refers to her husband as “Daddy.”

C.      The
Emotional and Physical Danger to the Children Now and in the Future

 

          The
record contains evidence that Father has been using illegal substances and that
refusing to acknowledge his drug use is problematic for the children.  Flores
testified that Father’s positive drug tests after drug rehabilitation indicate
that he failed to internalize the tools that he learned in rehab and that his
continued denial of his drug problem will prevent the effectiveness of rehab in
the future.  Father testified that he used heroin in June 2009 despite knowing
that it threatened his ability to get his kids back.  Flores testified that the
children should not have to wait any longer for their Father to prove his
sobriety and stability and that his current drug use threatens their safety
because of the probability that the children may access his drugs.

D.      The
Parental Abilities of the Individuals Seeking Custody

 

          Father
completed parenting classes in 2008, and Flores testified that Father acted
appropriately on his visits with the children.  Father testified that he has
only missed two visits since the children’s removal.  Father stated that he
reads books and plays games with the kids and that he has a good relationship
with the oldest child.  He said that she opens up to him about her life.  Father
further testified that he raised a family for thirty years with his late wife
and her three children.

          But
the evidence also indicates that Father has never provided proof of employment,
has never sustained a negative drug test, and his drug use impairs his judgment
and, therefore, his ability to care for the children.

          The
foster mother testified that she wants to adopt the children.  She and her
husband are both educators and, according to the foster mother, they engage in
educational activities with the children at their home.  The foster mother is
in the process of completing a Ph.D., and her husband has a Master’s degree.  The
foster mother also testified that she has the children involved in many
extracurricular activities, including sports and music.  She further stated
that she has taken the children on trips to the Atlantic Ocean and the Kennedy
Space Center.

E.      The
Programs Available to Assist Father and the Foster Parents to Promote the Best
Interests of the Children

 

          Father
testified that he would go into drug treatment if it meant getting his children. 
However, Flores questioned whether treatment would be effective for Father
because he continued to deny that he has a drug problem.  Father also testified
that despite the fact that he used drugs after attending a parenting class in
2008, he believed that one set of classes was sufficient.

          Flores
testified that if the foster parents are able to adopt the children, then the
children’s medical needs and state college tuition will be secured.

F.       The
Plans for the Children by the Foster Parents and Father

 

          The
foster mother testified that her vision for the next decade includes taking the
children on vacation once a year, maintaining their college funds, and teaching
them how to save money and be productive members of society.  The foster mother
said that she would do everything required of her to achieve permanency through
adoption as quickly as possible.  According to Flores, the current restrictions
on foster parents prevent them from fulfilling the children’s best interests.  Flores
also testified that Father has never provided TDFPS with a child care plan to
put in place if the children were returned to him.

G.      The
Stability of the Home or Proposed Placement

 

          The
foster parents are both elementary school teachers.  Father, on the other hand,
testified that he has not had a steady job in a year and a half, and his
testimony indicates that he has taken minimal efforts to obtain employment.[7]
 Flores testified that her concerns over Father’s stability were addressed by
requiring Father to make regular child support payments.  However, the evidence
indicates that he failed to make payments from February 2009 through December
2010 and that he owes over $6,000 in child support.  Flores also testified that
Father’s drug use exposes him to possible incarceration and that there is no
stability if Father is in and out of jail.  She further stated that Father has
had plenty of opportunity to prove his stability and sobriety but has failed to
do so.

H.      Father’s
Acts or Omissions Which May Indicate That the Existing Parent-Child
Relationship Is Improper

 

          The
evidence indicates that Father knew that T.A. was using drugs while she was the
primary caretaker of his children.  The evidence also indicates that Father had
opportunities to address T.A.’s drug use and its effects on the children
because Father testified that he lived down the street from the children and
visited them at T.A.’s home almost every day before TDFPS removed the children
in 2007.  Furthermore, Rietz testified that Father had been involved with T.A.
for a number of years and practically lived next-door to her.

          Father
argues that the record does not contain evidence that he committed an act or
omission toward or around the children that would indicate the parent-child
relationship is not proper.  However, the record is also flooded with evidence
of his illegal drug use as discussed in the above analysis.  Furthermore,
Father has failed to pay child support as he promised to do when he signed the “Agreed
Order for Actions Necessary for Parent to Obtain Return of Child” in 2009.

I.        Father’s
Excuse for His Acts or Omissions

 

          Father
argues that his failure to pay child support is excused by his inability to
work for a significant amount of time due to an accidental injury.  However,
the record does not indicate any excuses for why Father did not contact
specific employers or the Texas Workforce Commission for the two or three
months that he was able to work before trial.

          Father
also argues that his wife’s death “creat[ed] a reasonable assumption that some
of the family support resources that would have been otherwise available to [Father]
were lost” because “his wife was willing to assist him in taking” in the
children.  However, Father testified at trial that his wife died three years
ago and that someone else notified him to file for Social Security and
disability, but Father did not indicate that he has done so.

          Lastly,
Father seems to argue that his drug use is excused by TDFPS’s failure to
“clearly convey to [him] that there was an expectation that [he] would need to
complete additional drug treatment following the first termination trial in
2008.”  However, Father testified that he has never had a drug problem and that
he used drugs in June 2009 despite knowing that it would threaten his ability
to get his kids back.  Furthermore, Flores testified that Father’s original
service plan never expired and that he understood that he was obligated to
continue following CPS’s expectations under the original service plan.

          Considering
the relevant statutory factors in evaluating Father’s willingness and ability
to provide the children with a safe environment and the relevant Holley
factors, we hold that, in light of the entire record, and giving due
consideration to evidence that the trial court could have reasonably found to
be clear and convincing, the trial court could reasonably have formed a firm
belief or conviction that termination of Father’s parental rights to C.S.L.E.H.
and C.H.H. Jr. is in the children’s best interests.  Accordingly, we hold that the
evidence is legally and factually sufficient to support the trial court’s
family code section 161.001(2) best interest findings.  We overrule Father’s
third issue.

VI. Conclusion

          Having
overruled all of Father’s dispositive issues, we affirm the trial court’s order
terminating Father’s parental rights to C.S.L.E.H. and C.H.H. Jr.

 

 

 

BILL MEIER
JUSTICE

 

PANEL:  GARDNER, WALKER, and MEIER, JJ.

 

DELIVERED: 
August 25, 2011









[1]See Tex. R. App. P. 47.4.





[2]Father
told CPS workers that he had no hair because he was Native American.  However,
Father identified himself as African-American and not American Indian or
Alaskan native when registering to receive treatment at MHMR.  Father had hair
at the time of trial.





[3]Although the trial court
previously denied TDFPS’s petition to terminate Father’s rights, the family
code allows us to consider evidence presented in favor of termination that was
admitted at a previous hearing.  See In re D.S., 333 S.W.3d 379,
386 (Tex. App.—Amarillo 2011, no pet.); see also Tex. Fam. Code Ann. § 161.004(b)
(West 2008).  TDFPS alleged in its first amended petition for termination in suit
affecting the parent-children relationship “that the circumstances of the
child, sole managing conservator, or other party affected by the order denying
termination on December 17, 2008, have materially and substantially changed
since the date that order was rendered” and “that [Father] has committed an act
listed under Section 161.001 of the Texas Family Code before December 17,
2008.”  Father did not challenge either of these allegations at trial, and he
does not argue in his brief that the trial court could not consider evidence of
his conduct before the 2008 denial of termination.





[4]Father
did not challenge the three positive drug tests obtained prior to June 2009.





[5]Father did state that his
failure to perform one of the tests resulted from his daughter, who had given
him a ride, needing to leave and thus shortening his visit.





[6]Both children tested
positive for cocaine at birth.  T.A. admitted to using drugs during pregnancy
and to having a drug problem.





[7]Father
testified that has not gone to any specific employers or the Texas
Workforce Commission to look for a job.  He said only that he has been looking
for a job in different places and plans to file for disability.